# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JULES LETEMPS,**

                 **Petitioner,**

**v.**                                         **Case No:   6:13-cv-718-Orl-31KRS**

**SECRETARY, FLORIDA**
**DEPARTMENT OF CORRECTIONS and**
**ATTORNEY GENERAL, STATE OF**
**FLORIDA,**

                 **Respondents.**

_____

## ORDER

## I.  INTRODUCTION

     The Petitioner, Jules Letemps, was convicted of sexual battery and kidnapping on November 21, 1989.   The conviction, which was primarily based on the victim's identification of Letemps as the man who attacked her, came despite his testimony (and that of his live-in girlfriend and a roommate) that he was at home and in bed when the attack occurred.   There was no physical evidence tying Letemps to the crimes.   Initially, testing of a semen stain suggested that he could not have been the rapist.   But the FDLE technician who performed the analysis testified that the stain was too diluted for a valid test, and the jury never heard about the test results.

     On January 8, 1990, Letemps was sentenced to life in prison.   In the succeeding decades, Letemps – who is fluent only in Creole, and cannot read or write – has continued to maintain his innocence, filing numerous motions for post-conviction relief.   In 2011, Letemps obtained new counsel, who brought in serology experts to review the case.   The new counsel also discovered a cassette tape in the State Attorney's file, to which Letemps never had access.   The cassette tape

included a deposition of the technician who performed the semen stain analysis.   Upon review of the deposition, one of the newly retained serology experts discovered that the technician apparently used the wrong standard in doing her calculations – meaning that the test result exonerating Letemps had been valid.

Relying on this new evidence of his innocence, Letemps filed another motion for post-conviction relief in state court.   The trial court summarily denied this latest motion, and the denial was summarily affirmed by the Fifth District Court of Appeal.   Letemps then turned to the United States Court of Appeals for the Eleventh Circuit, which granted him permission to file the instant petition (Doc. 1) for habeas corpus relief pursuant to 28 U.S.C. § 2254.   Respondents filed a response (Doc. 14), and Letemps filed a reply (Doc. 19).

Letemps asserts that his trial counsel was ineffective in two areas:   (1) failing to investigate the serological testing and discover that the technician used an incorrect standard for testing, resulting in an incorrect interpretation of the testing results; and (2) failing to properly cross-examine witnesses and to attack the victim's identification of him as the assailant.

For the following reasons, the Court concludes that Letemps is entitled to relief.

## II.  PROCEDURAL HISTORY

On November 21, 1989, Letemps was convicted of three counts of sexual battery and one count of kidnapping.   (App. A at 240-43)**.**   The trial court sentenced Letemps to four terms of life in prison.   *Id.* at 191.   Letemps appealed, and the Fifth District Court of Appeal affirmed *per curiam* on January 23, 1991.   (App. D).   After the conclusion of his appeal, Letemps repeatedly sought seek post-conviction relief under both state and federal law.[1]

---

[1] While his appeal was pending, Letemps filed a petition for writ of habeas corpus with the Fifth District Court of Appeal.   (App. F).   The appellate court denied the petition on February 9,

On September 15, 2011, Letemps filed, through counsel, a second Rule 3.850 motion for post-conviction relief in state court, alleging that he was actually innocent.   (App. EEE).   The trial court summarily denied the motion.   (App. HHH).   The appellate court affirmed *per curiam* on January 29, 2013.   (App. JJJ).   The mandate issued on February 22, 2013.   (App. KKK).   On March 11, 2013, Letemps filed a motion for leave to file a second or successive petition for writ of habeas corpus with the Eleventh Circuit Court of Appeals.   (App. LLL).   On April 9, 2013, the Eleventh Circuit granted the motion.   (Doc. 1-1).   Letemps filed this federal habeas petition on May 6, 2013.   (Doc. 1).

### III.   TIMELINESS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, a state prisoner ordinarily has one year in which to file a federal petition for habeas corpus, starting from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."   28 U.S.C. § 2244(d)(1)(A).   If the petition alleges newly discovered evidence, however, the filing deadline is one year from "the date on

---

1990 (App. G).

On March 13, 1991, Letemps filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure.   (App. H).   The trial court summarily denied the motion on April 5, 1991 (App. I).   Letemps did not appeal.   On April 4, 1995, Letemps filed a federal habeas corpus petition in this Court.   *See* Case No. 6:95-cv-363-Orl-18.   This Court denied the federal habeas petition on March 28, 1996.   (App. L).   The Eleventh Circuit Court of Appeals denied Letemps's application for a certificate of probable cause on August 2, 1996. (App. M).

On January 28, 1997, Letemps filed a second petition for writ of habeas corpus with the Fifth District Court of Appeal.   (App. N).   The appellate court denied the petition on February 21, 1997.   (App. Q).   Between October 28, 1997, and September 25, 2006, Letemps filed approximately six additional motions for post-conviction relief which were denied.   (App. R – DDD).

which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."   § 2244(d)(1)(D).

Letemps filed this petition on May 6, 2013.   Although the limitation period set forth in § 2244(d)(1)(A) is subject to tolling and to some exceptions, it is undisputed that it ran before Letemps filed the instant petition.   And though this petition is based in part on newly discovered evidence,[2] Letemps admits that the evidence at issue was discovered in August of 2011.[3]   Thus, under either provision, this petition would be barred as untimely.

## IV.   ACTUAL INNOCENCE

However, Letemps argues here that he is actually innocent.   As described by the Supreme Court, the "miscarriage of justice" exception permits a prisoner who makes a credible showing of actual innocence to pursue his constitutional claims on the merits, notwithstanding a procedural bar to relief or the expiration of AEDPA's statute of limitations.   *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1931-32 (2013) (allowing § 2255 petition to proceed based on newly discovered evidence obtained almost six years before petition was filed).   This exception "is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."   *Id.* at 1931 (citing *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993)).   The exception applies to a "severely limited" category of cases: ones in which new

---

[2]   Letemps contends that he was unable to uncover the evidence that the Florida Department of Law Enforcement ("FDLE") technician had made an error in testing the semen stain before August 11, 2011, when his serology expert reviewed the transcript of the technician's deposition.   The cassette tape containing the deposition had been discovered on July 21, 2011 and transcribed on July 29, 2011.    (Doc. 1-1 at 29-30; Doc. 4, Letemps's App. at 59a).

[3]   Letemps filed his second Rule 3.850 motion on September 15, 2011.   (App. FFF). However, the state court denied the motion as untimely.   (App. HHH).   Because of this, the one-year period of limitation in § 2244(d)(1)(D) was not tolled while the Rule 3.850 motion was pending.   *See Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318 (11th Cir. 2006).

evidence shows it is more likely than not that no reasonable juror would have convicted the petitioner.  *Id.* at 1933 (citing *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).  *See also House v. Bell*, 547 U.S. 518, 538 (2006) (holding that, in addressing an actual innocence claim, petitioner's burden "is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.").

"An actual-innocence claim must be supported 'with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Milton v. Sec'y, Dep't of Corr.*, 347 F. App'x 528, 530-31 (11th Cir. 2009) (quoting *Schlup*, 513 U.S. at 324).   A "habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  *House,* 547 U.S. at 538.   A court may also consider "how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."  *Id.* at 537 (quotation omitted).

Thus, to address Letemps's claim of actual innocence, a review of the testimony at trial is necessary.

## V.   TRIAL TESTIMONY

A.      The Victim

The victim testified that at approximately 4:30 or 5:00 a.m. on May 29, 1989, she was waiting at a bus stop when a man walked toward her, grabbed her, and put a metal object or knife to her neck.   (App. A at 19-26).   The man instructed her to walk behind a tree and remove her clothes.  *Id.* at 26-28.   She was forced to perform fellatio on her attacker and then to submit to sexual intercourse.  *Id.* at 30-32.   The attacker then put his clothes on, forced the victim to her

feet, walked her to another area, and attempted to penetrate her anus.  *Id.* at 34-35.   When the victim noticed that the perpetrator no longer had the metal object in his hands, she ran to a nearby home to ask for help.  *Id.* at 35.   The owner of the home let her in, gave her a robe to wear and called the police.  *Id.* at 36.

The victim testified that her attacker was a black man with a scar over his left eye and a missing tooth.  *Id.*   The victim also stated the man wore a navy blue and white shirt, jeans, and sneakers.  *Id.* at 37.   After giving her statement to police, she went home and showered.  *Id.* at 38-39.   She also contacted her cousin, Jose Maldonado ("Maldonado"), who came to her home. *Id.* at 39.   She and Maldonado drove back to the area where the attack had occurred, looking for the attacker.  *Id.* at 39-40.   Eventually, they encountered Letemps walking down the street, and she identified him as her attacker.  *Id.* at 40.   She and Maldonado contacted a police officer, who arrested Letemps.  *Id.* at 41-42. She testified that, when she made a positive identification of him to the police, Letemps threatened to kill her.[4]  *Id.* at 42.

B.      The Homeowner

The owner of the home that the victim ran to, Sherman Williams ("Williams"), testified that he heard someone yelling outside his door at about 5 a.m.  *Id.* at 57.   When he answered the door, the victim ran in, crying.  *Id.* at 58.   Because she was naked, he gave her the robe he was wearing, and then called the police.  *Id.* at 58-59.

C.      The Police

Officers Peter Linnenkamp and Juan C. Viamontes took the victim's statement at Williams's home.  *Id.* at 62-63, 70.   The officers observed that the victim was distressed, crying,

---

[4] Two police officers testified that, when the victim made her formal identification of Letemps as he sat in a squad car, Letemps said that he would kill her if she made him spend time in jail.  *Id.* at 88, 95.

and shaking.   *Id.* at 63, 68-69.   Officer Linnenkamp was unable to obtain much information from the victim, because she was very upset and spoke "very little English."   *Id.* at 63.   The victim gave him only a "very general description" of her attacker – that he was a "short black male."   *Id.* at 64.   Officer Linnenkamp called for assistance from Officer Viamontes, who, like the victim, spoke Spanish.   *Id.* at 64.

Speaking in Spanish with Officer Viamontes , the victim identified her attacker as a short black male wearing a two-toned, multi-colored shirt, and blue jeans.   *Id.* at 70.   Officer Viamontes did not recall the victim describing her attacker as having any unusual facial characteristics but said that if she had mentioned them, he would have included them in his report. *Id*. at 69-70.

D.     Jose Maldonado

Maldonado, the victim's cousin, testified that the victim called him approximately two hours after the attack.   *Id.* at 73.   He testified that when he arrived at her home, she described her attacker as a short black male with a scar over his left eye who was wearing blue jeans, a blue shirt with white stripes on the sleeves, black tennis shoes, and a cigarette pack folded in his sleeve.   *Id.* at 81.   The victim and Maldonado drove back toward the scene of the crime and, after circling around for a while, the victim spotted a man (subsequently identified as Letemps, *id.* at 82) walking down the street, and she said he was the man who had attacked her.   *Id.* at 78-79. Maldonado testified that the man's appearance and clothing matched the victim's earlier description.   *Id.* at 82.   Maldonado informed a police officer, who stopped Letemps.   *Id.* at 79.

E.      FDLE serologist Nancy Rathman

Nancy Rathman ("Rathman"), a forensic serologist, testified that she examined the robe worn by the victim after the attack and found a stain.   *Id.* at 109-13.   She was able to verify that the stain contained semen.   *Id.* at 113-114.   She intended to determine, if possible, the blood type of the donor of the semen.   *Id.*   However, a test to indicate the amount of semen present in the stain indicated that it "was at such a dilution that my blood grouping test would ... not show you anything."   *Id.* at 114.

F.      Letemps and other witnesses for the defense

Letemps called two witnesses – his live-in girlfriend and a roommate – who testified that they saw him in the house the evening before the crime and at approximately 6:30 a.m. the next morning.   *Id.* at 122-25; 129-30.   His girlfriend testified that he was in bed with her the whole time, and that she would have known if he had gotten out of bed prior to 6:30 a.m.   *Id.* at 129. Letemps testified that he was at home, asleep, when the crimes were committed, that his roommate woke him up at 6:30 a.m., and that he left his house to walk to work at 7:00 a.m.   *Id.* at 133-36. Letemps admitted making the threat to kill the victim if he had to go to jail, but explained that he did so "because I was scared what she said I do, try to take my life away, tell me I rape her. That's make me say that, and I don't mean to say that."   *Id.* at 136.

## VI.   SEROLOGICAL EVIDENCE

A.      Rathman's tests

At a deposition conducted prior to the original trial, Rathman stated that she performed the "absorption inhibition technique" (henceforth, the "absorption test") on a sample extracted from the stain found on the robe worn by the victim after the attack.   (Pet's App. at 42a-43a).   The absorption test can often be used to identify the blood type – *i.e.*, type A, type B, type AB, or type

O – of the donor of a body fluid, such as semen, saliva, or vaginal fluid.  *Id.* at 37a-38a.   It does so by detecting blood group substances in the fluid.  *Id.* at 24a.   One reason the absorption test is not always successful is that not every person has these blood group substances in their body fluids.  *Id.*   The people whose blood group substances are detectible in their body fluids are referred to as "secretors".  *Id.*   It is undisputed that the victim is an O secretor, and that Letemps is a B secretor.[5]  *Id.* at 47a, 48a.

To perform the absorption test, Rathman cut up some fabric from the area where the stain had been found, dropped it into a test tube, and added saline to extract the stain contents from the fabric.  *Id*. at. 39a-40a.   She then tested the resulting extract for the presence of type A, B, AB, and O blood group substances.  *Id.* at 40a-43a.   The extract tested positive for type O, only.  *Id.* at 43a.

Rathman said that in testing any semen stain, she must assume that the stain is a mixture of both semen and vaginal fluid.[6]  *Id.* at 47a.   Because the victim was an O secretor, the test result was consistent with the victim being a source of the material found in the stain.  *Id.*   Rathman noted that Letemps is a B secretor.  *Id.* at 48a.   If the semen donor had been a B secretor, and the mixture contained enough semen for a valid test, then the extract should also have tested positive for type B.  *Id.*

To determine whether the stain contained a sufficient concentration of semen for blood typing, Rathman performed a P30 test.   (Pet's App. at 49a).   P30 is a protein only found in seminal fluid.  *Id.*   Rathman explained that by determining the amount of P30 in a stain, it is

---

[5]  In 2011, Williams submitted to testing and was determined to be an A secretor.  *Id.* at 12a.   He also provided a sworn statement that he was the only person who had worn the robe before he gave it to the victim.  *Id.* at 30a.

[6]  Rathman said there is no test to identify the presence of vaginal fluid.  *Id.*

possible to calculate the amount of semen present and, by extension, determine whether there is enough to be able to detect any blood group substances that might be present in the semen.   *Id.* at 50a.   According to Rathman, "you would need approximately a 1 in 200 dilution to be assured that you would be picking up the blood type of the semen donor in a stain."   *Id.*   She attributed this 1-in-200 cutoff figure to "the Serological Research Institute, [which originated] this technique".   *Id.*

Rathman stated that the P30 level in the sample worked out to a semen dilution ratio of "approximately 1 in 322.".   *Id.*   Rathman stated that due to the dilution, Letemps could not be ruled out as a contributor of the semen, even though the absorption test had not detected his blood type.   *Id.* at 53a.

In her deposition, Rathman did not explain how she performed the calculation to obtain the 1 in 322 dilution ratio.   However, as described *infra*, her bench notes indicate that she reached this result by comparing the amount of P30 found in the extract from the stain to the amount of P30 that would be found in a so-called "neat" (or undiluted) semen stain.   *Id*. at 13a.   At her deposition, Rathman stated that "5,000 units of P30 would be what you would consider a … a neat semen stain."   *Id.* at 51a.

B.   Elaine Pagliaro

Letemps provides the June 2011 affidavit of forensic scientist Elaine M. Pagliaro ("Pagliaro"). *Id.* at 22a.   Pagliaro notes that the victim had type O blood and was a secretor, *id.* at 25a, and that only the O blood group factor was found in the stain on the robe.   *Id.* at 28a.   After reviewing the records, Pagliaro opines that, assuming that blood group substances were at detectible levels in the semen stain on the robe, the following interpretations would be

scientifically accurate: (1) Letemps is excluded as a source of the semen; (2) the semen donor was an O secretor or a non-secretor.   *Id.* at 28a.

Pagliaro also attests that P30 levels can vary across a stain, independently of the concentration of blood group substances.   *Id.* at 28a-29a.   Because of this, even with a reduced level of P30, it cannot be stated as a certainty – as Rathman did at trial – that the absorption test results "would not show you anything."   *Id.* at 28a.   Pagliaro concludes that, "[s]o as not to be misleading to the trier of fact, it would be important to state that if [blood group substances] from the semen donor were at detectible levels in some portions of or all of the stain, Mr. Letemps would be excluded as a source of that semen."   *Id.* at 29a.

C.   Gary Harmor of SERI

Letemps also provides the affidavit of Gary C. Harmor ("Harmor"), the senior forensic serologist of the Serological Research Institute ("SERI"), where he has worked since 1979. (Pet.'s App. at 11a).   Harmor first became involved in the instant case in 2011.   *Id.* at 12a. Harmor attests that, after receiving and reviewing Rathman's written bench notes, Rathman's deposition transcript, and the trial transcripts, he determined that Rathman had performed the calculation for the P30 test incorrectly.   *Id.* at 12a-13a.

According to her notes, Rathman determined that the extract she created had a P30 concentration of approximately 15.49 units.   *Id.* at 13a.   To determine how diluted the extract was, Rathman compared that 15.49-unit figure to the amount of P30 she believed were to be found in a so-called "neat" (or undiluted) semen stain: 5,000 units.[7]   *Id.*   This resulted in a dilution ratio of approximately 1 in 322.   *Id.*

---

[7] Harmor states that Rathman's notes do not specify the figure used for the neat semen stain, and he did not realize that she was using the 5,000-unit figure until he read her deposition transcript.   *Id.*

Harmor states that, for purposes of SERI's method, the proper figure for the neat semen stain is 3,000 units of P30, not 5000 units, and that this was the figure taught in SERI workshops on systematic semen analysis in the 1980s.[8]   *Id.*   When the 15.49 unit concentration found by Rathman is compared to a 3,000-unit neat stain, the result is a dilution of 1 in 193 (rather than the 1 in 322 calculated by Rathman).   *Id.* at 14a.   This figure satisfies the 1 in 200 dilution minimum for accurate blood group detection using the absorption test.   *Id.* at 14a.   Therefore , if the semen donor had been a secretor, Rathman's test should have detected his blood type.[9]   *Id.*

---

[8]  Harmor says SERI chose 3,000 units as the proper figure for its method because an extract made from a semen stain is never "neat" – even if it starts out undiluted, the stain is diluted by making the extract – and because a study determined that neat samples from 97 percent of men in the general population would be at or below 3000 units.   *Id.*   According to SERI's procedures for P30 testing, dated September 29, 1989, the 3,000-unit figure was also selected to account for the fact that semen stains "will also experience some loss due to drying and degradation."   *Id.* at 63a.

[9]  Respondents contend that the 5,000-unit figure used by Rathman was the correct figure. To support their contention, Respondents have provided what purports to be an excerpt from a SERI training manual dated August 1-12, 1988 (henceforth, the "1988 Manual").   (App. FFF). In the excerpt, the figure to be used as the starting point for the P30 dilution test is given as 5,000 units, rather than 3,000.   Respondents have not provided an affidavit from Rathman or anyone else explaining where the 1988 Manual came from or attesting that Rathman relied on it in performing the P30 test at issue here.

More importantly, counsel for Letemps filed a Florida public records request in September 2011 seeking the procedures or policies used by FDLE – Rathman's employer – for P30 testing in 1988 and 1989.   *Id.* at 58a.   In response, FDLE did not provide the 1988 Manual.   Instead, FDLE produced a copy of SERI's procedures for P30 testing, dated September 29, 1989.   *Id.* at 59a-61a.   Consistent with Harmon's statement, those testing procedures instruct the person performing the test to "assume[] that the original concentration of P30 in the semen in the test stain is 3000 ugs/ml" and to divide the "ug/ml value of each unknown into 3000 to give an estimate of semen dilution."   *Id.* at 63a.   Rathman conducted her tests in October and November, 1989.   *Id.* at 71a-89a.

Finally, even assuming *arguendo* that Rathman relied on the 1988 Manual in choosing the 5,000-unit figure, this would do little to help Respondent's case, as they have not provided any expert testimony to counter Harmor's expert opinion that 3,000 units was the proper figure.

Because there was sufficient semen in the extract to provide accurate blood group detection, Harmor says that the proper conclusions to be drawn from the results of Rathman's absorption test are (1) the semen donor is either an O secretor or a non-secretor and (2) A secretors, B secretors and AB secretors would be excluded as semen donors.   *Id.* at 14a.   Because Letemps is a B secretor, Harmor opines that he can be excluded as the donor of the semen.   *Id.* at 15a.   In addition, Harmor opines that Williams, an A secretor, is also excluded as the donor.   *Id.*

Harmor also noted that Rathman performed a microscopic analysis of the semen stain and failed to detect spermatozoa.   *Id.* at 13a.   Because of this, Harmor opines that the donor of the semen very likely had a low sperm count or was sterile.   *Id.* at 15a.   Harmor also noted that he was told Mr. Letemps has biological children, indicating that he has spermatozoa in his seminal fluid.   *Id.*

## VII.   CONCLUSION AS TO ACTUAL INNOCENCE

Letemps contends that the new evidence establishes to a virtual certainty that Letemps is innocent.   (Doc. 19 at 28).   Respondents argue that this evidence does not conclusively exclude Letemps as a contributor of the semen, because approximately 3 percent of known neat samples have more than 3000 ug/ml of P30.   (Doc. 14 at 24-25).   Respondents do not further explain how this fact undermines Harmor's expert opinion that the absorption test establishes Letemps's innocence or, more importantly, produce a serology expert who has reached such a conclusion.

With this new evidence, Letemps has presented a credible claim of actual innocence.   The unrebutted testimony of the robe's owner, Sherman Williams, that no one other than himself wore the robe before he gave it to the victim establishes that either he or the rapist must have been the donor of the semen that Rathman found on it.   Harmor's expert testimony effectively rules out

both Williams and Letemps as the donor, meaning that the rape was committed by someone other than Letemps.

While it is true that this blood type evidence does not directly refute the victim's identification of Letemps, the eyewitness testimony is not especially powerful, particularly in light of how vague the victim's description was before she spotted Letemps walking down the street. In addition, the Supreme Court has noted that "eyewitness misidentification is the single greatest cause of wrongful convictions" in the United States.   *Perry v. New Hampshire*, 132 S. Ct. 716, 738 (2012).   When reviewing the new evidence along with Letemps's alibi testimony and the inconsistent identification testimony, the Court concludes that sufficient doubt has been raised about Letemps's guilt to undermine the confidence in the result of his trial.   See *Schlup*, 513 U.S. at 317.   When confronted with this additional evidence, no reasonable juror would have convicted Letemps. *See McQuiggin,* 133 S.Ct. at 1933.   Consequently, the new evidence is sufficient to overcome the expiration of AEDPA's one-year limitations period, and the Court will review the merits of the habeas petition.

## VIII.   LEGAL STANDARDS

A.      Standard of Review Under AEDPA

Pursuant to AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   The phrase "clearly established Federal law," encompasses only the

holdings of the United States Supreme Court "as of the time of the relevant state-court decision."

*Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the

'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal

court must consider."   *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).

The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v.

Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by
> [the United States Supreme Court] on a question of law or if the
> state court decides a case differently than [the United States
> Supreme Court] has on a set of materially indistinguishable facts.
> Under the 'unreasonable application' clause, a federal habeas court
> may grant the writ if the state court identifies the correct governing
> legal principle from [the United States Supreme Court's] decisions
> but unreasonably applies that principle to the facts of the prisoner's
> case.

Even if the federal court concludes that the state court applied federal law incorrectly,

habeas relief is appropriate only if that application was "objectively unreasonable."   *Id.*   Whether

a state court's decision was an unreasonable application of law must be assessed in light of the

record before the state court.   *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (*per curiam*); *cf. Bell

v. Cone*, 535 U.S. 685, 697 n. 4 (2002) (declining to consider evidence not presented to state court

in determining whether its decision was contrary to federal law).

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state

court's decision "was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."   Generally speaking, determination of a factual issue

made by a state court, shall be presumed correct, and the habeas petitioner shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence.   *See Parker*, 244 F.3d

at 835-36; 28 U.S.C. § 2254(e)(1).   However,

> AEDPA's "statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact."   *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.2001).   Ineffective assistance of counsel claims present mixed questions of law and fact not entitled to a presumption of correctness. *See Cade v. Haley*, 222 F.3d 1298, 1302 (11th Cir.2000) (stating *Strickland*'s deficient performance and prejudice prongs "present mixed questions of law and fact reviewed de novo on appeal").

*Debruce v. Comm'r, Alabama Dep't of Corr.*, 758 F.3d 1263, 1266 (11th Cir. 2014) *cert. denied*

*sub nom. Dunn v. DeBruce*, 135 S. Ct. 2854 (2015).

> B.     Standard for Ineffective Assistance of Counsel Claims

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984),

established a two-part test for determining whether a convicted person is entitled to relief on the

ground that his counsel rendered ineffective assistance.   The convicted person must prove: (1)

that counsel's performance was deficient and "fell below an objective standard of reasonableness";

and (2) that the deficient performance prejudiced the defense.   *Id.* at 687-88.   To establish

prejudice, the convicted person "must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.   A

reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id* at

694.

A court must adhere to a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance.   *Id.* at 689-90.   "Thus, a court deciding an actual

ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts

of the particular case, viewed as of the time of counsel's conduct."   *Id.* at 690; *Gates v. Zant*, 863

F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).   Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."   *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## VIII.   ANALYSIS

A.     Serology testing

Letemps alleges trial counsel was ineffective for failing to investigate the testing standard used by Rathman.   (Doc. 1-1 at 13).   Letemps states that because counsel failed to investigate the testing procedures, counsel failed to discover that Rathman's "inconclusive" finding "represented an inaccurate, incomplete and incorrect interpretation of the testing results."   *Id.*   Letemps argues that as a consequence of counsel's actions, the jury was not told the proper interpretation of the semen results.[10]   *Id.*

---

[10] Indeed, Letemps's trial counsel moved *in limine* to exclude the test results, which if properly evaluated would have exonerated him.

Letemps also alleges that counsel improperly questioned Williams regarding the semen stain and attempted to establish that Williams was the donor of the semen.  *Id.* at 14.   Letemps asserts that had counsel properly investigated, she would have realized that Williams could not have been the donor.  *Id.* at 14.   Finally, Letemps states that because no sperm was found in the semen, counsel should have argued that Letemps – who had three young children – clearly did not have a low or nonexistent sperm count and could not have been the donor.  *Id.* at 15.

Letemps raised this claim in his Rule 3.850 motion.   (App. EEE).   The State argued that the claim was untimely, successive, and barred by the doctrine of laches.   (App. FFF).   The State also argued that Letemps was not entitled to relief on the merits of his claim.   *Id.*   The trial court denied the motion "for the reasons set forth in the State's response."   (App. HHH).   The appellate court *per curiam* affirmed.   (App. JJJ).

### B.   Cross-examination

Letemps also claims trial counsel was ineffective for failing to properly cross-examine witnesses and attack the victim's identification of Letemps as the assailant.   Doc. 1-1 at 20.   In support of this claim, Letemps maintains that counsel failed to specifically question the victim about a vehicle she saw before she was assaulted.   *Id.* at 20-21.   Next, Letemps asserts that counsel failed to cross-examine Officers Linnenkamp and Viamontes about the victim's description of her attacker.   *Id.* at 22-24.   Letemps also contends that counsel should have cross-examined Officer Ford regarding which direction he observed Letemps walking when he was arrested.   *Id.* at 25-26.   Finally, Letemps argues that counsel failed to cross-examine Maldonado about where he saw Letemps prior to his arrest.   *Id.* at 26-27.

Letemps made these allegations in his Rule 3.850 motion.   (App. EEE).   The State argued the claim was untimely, successive, and barred by the doctrine of laches.   (App. FFF).   The State

argued in the alternative that Letemps had not demonstrated deficient performance or prejudice

pursuant to *Strickland*.   Id.   The Fifth District Court of Appeal affirmed *per curiam*.   (App. JJJ).

As to the failure to cross-examine regarding the vehicle[11] and to cross-examine the two

officers,[12] the Court agrees that Letemps has failed to demonstrate deficient performance.   In

---

[11] During her deposition, the victim stated that prior to the crimes, she had observed her attacker drive by the bus stop in a van.   (Pet's App. at 272a-273a).   The victim also stated that it "has a cabin, like for two or three people, and then it's open in the back."   Id.    At trial, the victim stated that she observed a van drive by, stop near her, and then continue driving.   (App. A at 21).   Defense counsel did not cross-examine the victim as to whether the van was a truck or whether she saw Letemps in the vehicle.

As to this point, Letemps cannot demonstrate prejudice.   The issue of whether the victim saw a van instead of a truck was essentially irrelevant to the case.   Additionally, Letemps seems to argue that if the victim did not see him in the van, then her testimony would be called into question.   However, regardless of whether she saw Letemps in some vehicle prior to the crime, she did identify him as her attacker.

[12] Letemps contends that counsel should have cross-examined the police officers about the victim's description of her assailant.   Letemps states that had counsel done so, the jury would have learned the victim did not describe any of Letemps's identifying characteristics until after he was detained.

Officer Linnenkamp testified that the victim gave a general description of her attacker. (App. A at 64-65).   However, Officer Linnenkamp also stated that the victim did not speak much English, and so he called Officer Viamontes, a Spanish-speaking officer, to take her statement. Id. at 64.   Officer Viamontes testified that the victim identified her attacker as a short black male wearing a two-toned, multi-colored shirt, and jeans.   Id. at 70.   In his police report, Officer Viamontes stated that the victim described the assailant as a black male wearing a two-tone multi-colored shirt, blue jeans, and white sneakers.   (Pet. App. at 95a).   Officer Viamontes did not recall the victim describing her attacker as having any unusual facial characteristics, and the police report does not mention Letemps's scar and missing tooth.   Id.; (App. A. at 69).

However, Maldonado testified that when he arrived at the victim's home, she described the assailant's scar, missing tooth, and cigarette pack.   Id. at 81.   Therefore, even if counsel had cross-examined Officer Viamontes or Maldonado on the matter, no prejudice resulted.   Moreover, the Court notes that the officers described the victim as distressed, crying, and shaking, which could otherwise account for the inconsistencies in her description.   Other than the description of the color of Letemps's shoes, the victim's statement matched the clothing Letemps was wearing when he was stopped.

regard to the failure to cross-examine regarding Letemps's direction of travel when arrested, however, the Court reaches a different conclusion.

On the date in question, Letemps lived on Lake Mann Drive.   (App. A. at 123, 128, 133). Letemps's home was south of the location where the crime was committed, and his place of employment was north of the location.   (Doc. 1-1 at 25).   Officer Ford, the arresting officer, testified at trial that when he first observed Letemps, he was walking southbound on Cottage Hill Road, close to Lake Mann Drive.   (App. A at 85).   In his police report, however, Officer Ford stated that he "followed Maldonado and [the victim] to the 300 blk of Cottage Hill Road where they pointed to a black male who was walking *north bound* on the west side of the street."   (Pet's App. at 98a) (emphasis added).

Maldonado testified that he first observed Letemps "coming behind the apartment complex."   (App. A at 77).   It is unclear where the apartment complex was located.   Letemps contends that Maldonado observed him leaving the apartment complex where he lived and walking north on Cottage Hill Road.   (Doc. 1-1 at 26-27).   Letemps states that this is consistent with his alibi that he was walking (northward) to work after waking up at 6:30 a.m.   *Id.* at 27.

As to this issue Letemps has demonstrated deficient performance.   Had counsel questioned Officer Ford and impeached him with the police report, the jury would have learned that Letemps was observed walking northbound on Cottage Hill Road.   Instead, Officer Ford's unimpeached testimony allowed the jury to conclude that Letemps was walking home from the crime scene instead of making the reasonable determination that Letemps was walking to work.

C.      Conclusion

As discussed above, Rathman used the incorrect standard when she tested the semen stain. Had defense counsel further investigated the testing procedures used by FDLE in 1989, she would

have discovered Rathman's mistake regarding the conclusions that could be drawn from the absorption test.   Furthermore, if counsel had learned of Rathman's use of the incorrect testing standard, she would have used that information to exonerate her client, instead of moving *in limine* to exclude any reference to blood typing at trial.   Because of this, and because of the failure to impeach Officer Ford regarding his direction of travel when arrested, Letemps has demonstrated deficient performance on the part of counsel.

In addition, Letemps has met his burden with regard to the second prong of *Strickland*. The jury was told that the results of the analysis of the semen stain were inconclusive.   However, when properly analyzed, Rathman's absorption test provides powerful evidence that excludes Letemps as the perpetrator.   Although the victim identified Letemps as her assailant, Letemps presented testimony that he was at home when the crimes were committed.   When reviewing the new evidence in conjunction with the evidence that would have been presented at trial if counsel had performed reasonably, the Court is persuaded that there is a reasonable probability that the outcome would have been different.

Having determined that the assistance provided by Letemps's counsel fell below the constitutionally required threshold, the Court must decide whether the state court unreasonably applied *Strickland* in denying Letemps's most recent motion for post-conviction relief.   The Court has little difficulty in doing so.   Letemps's motion, which included the ineffective assistance claims that this Court has found to be meritorious, was denied "for the reasons set forth in the State's Response" and summarily affirmed by the Fifth District Court of Appeals.   (Doc. 14 at 7).

The bulk of the response is comprised of arguments that Letemps's latest motion is untimely or procedurally defaulted.   As to the merits, the arguments are primarily based on the 1988 Manual, and its citation to 5000 units as the assumed original concentration of P30 in the

semen in a test stain.   (App. FFF).   According to Respondents, this shows that 5,000 units was the correct standard, which would mean that Rathman interpreted the P30 test properly (thereby undermining the actual innocence claim) and that Letemps's counsel was not deficient in failing to discover otherwise (thereby undermining the *Strickland* claim).   But as noted above, there is no evidence in the record that Rathman relied on the 1988 Manual.   More importantly, there is no evidence that 5,000 units was actually the proper standard in October and November of 1989 (when Rathman performed her tests) rather than the 3,000-unit standard that SERI had in place at the time, according to the affidavit or SERI's senior forensic serologist, Harmor.

The Respondents also argue that, even if the 3,000-unit standard should have been employed, it would not have entirely excluded Letemps as the donor of the semen, because 3 percent of known neat semen samples fall above this 3,000-unit threshold.   There is no expert testimony supporting this argument.   Even assuming *arguendo* that the argument is scientifically valid, and taking the argument at face value, a test result showing that there is at most a 3 percent chance that Letemps was the source of a semen stain that must have originated from the rapist is still very powerful evidence of Letemps's innocence.

Finally, the Respondents argued that the failure to impeach Officer Ford with the contents of his report (which documented Letemps walking north, toward the place he worked, when Officer Ford arrested him) was a reasonable strategy on the part of Letemps's counsel. According to Respondents, Officer Ford's report also documents Letemps first being sighted by the victim and Maldonado on Spaulding Avenue, a street two blocks south of the street on which he resided, and opening up the report would have undermined Letemps's claim to have been walking north to work that morning.   However, unlike Officer's Ford's description of the location of the arrest, which was based on firsthand knowledge, his description of the location where the

victim and Maldonado first spotted Letemps is simply hearsay.   In addition, there is no evidence that Letemps's counsel intentionally refrained from impeaching Officer Ford, rather than simply failing to do so.

Simply stated, there is no evidence supporting the conclusions reached by the state court in regard to the failure to investigate the serological evidence or the failure to impeach Officer Ford. In light of the foregoing, the Court concludes that the state court's application of *Strickland* was not merely incorrect, but unreasonable.   Accordingly, Letemps is entitled to relief.[13]

In consideration of the foregoing, it is ORDERED AND ADJUDGED as follows:

1.       The Petition for Writ of Habeas Corpus filed by Jules Letemps (Doc. 1) is **GRANTED** as to Letemps's claims that counsel failed to investigate the serology evidence and counsel failed to cross-examine Officer Ford regarding the direction in which Letemps was walking when he was arrested.   The petition is **DENIED** as to Letemps's remaining claims.

2.       The writ of habeas corpus will be conditionally **GRANTED**, for the reasons

---

[13] Any of Letemps's allegations not specifically addressed herein have been found to be without merit.

discussed above, within NINETY (90) DAYS from the date of this Order, unless the State of

Florida holds a new trial in state court case number 1989-CF-5137.

      3.      Letemps is **DENIED** a Certificate of Appealability.[14]

      **DONE** and **ORDERED** in Chambers, Orlando, Florida on July 20, 2015.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[14] A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180 (2009). "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) or, that "the issues presented were adequate to deserve encouragement to proceed further," *Miller El v. Cockrell*, 537 U.S. 322, 335 36 (2003). Letemps has not made the requisite showing in these circumstances.